THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re: T-Mobile 2022 Customer Data Security Breach Litigation | MDL No. 3073 |

**DEFENDANTS T-MOBILE US, INC. AND T-MOBILE USA, INC.'S RESPONSE TO MOTION FOR TRANSFER FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Defendants T-Mobile US, Inc. and T-Mobile USA, Inc. (collectively, "T-Mobile") respond to the Motion for Transfer for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407 ("Petition" or "Pet.") filed by Plaintiff in *Clark*. For the reasons set forth herein, T-Mobile opposes transfer. If the Panel disagrees, it should transfer these actions to the Western District of Missouri or the District of Kansas.

### I.   INTRODUCTION

In January 2023, T-Mobile announced it was the victim of a criminal cyberattack in which the bad actor obtained non-sensitive personal information for certain T-Mobile customers (the "Cyberattack"). In the wake of that announcement, a number of putative class action lawsuits have been filed against T-Mobile. In the Petition, Plaintiff points to prior data breach litigation, arguing that the Panel has consolidated pursuant to Section 1407. Plaintiff also leans on the 2021 T-Mobile data breach, arguing that because the Panel consolidated actions arising out of that incident then it should do the same thing here. But the Cyberattack is different in a number of key respects, including the fact that it only impacted the information of T-Mobile customers—all of which are contractually obligated to resolve their claims against T-Mobile through individual arbitration, not class action litigation. T-Mobile will therefore move to compel arbitration of each named

1

plaintiff's claims. If granted, those motions will eliminate class action litigation over the Cyberattack. The Panel should therefore deny the Petition because:

- Transfer will not promote the just and efficient conduct of the action as required by 28 U.S.C. § 1407(a). T-Mobile's motions to compel arbitration turn on individual, plaintiff-specific evidence showing that the plaintiff agreed to individual arbitration. Transfer for coordinated or centralized pretrial proceedings will not eliminate those individualized inquiries. Rather, it would add a layer of litigation procedure that is inconsistent with the strong federal policy favoring the prompt enforcement of arbitration agreements and—as seen in a recent data breach MDL—is unlikely to provide any result in a protracted timeline for resolving the gating issue of arbitration.

- There is nothing complex or specialized about motions to compel arbitration—these are just the types of motions that district courts resolve on a routine basis. Denying the Petition will allow the district courts in which the actions were filed to resolve the motions as they would have but-for the Petition.

- In the unlikely event the motions are denied and class action litigation proceeds, then as the Panel recently explained: "[T]he parties may file another Section 1407 motion, and the Panel will revisit the question of centralization." *In re Gen. Motors LLC Chevrolet Bolt EV Battery Prods. Liab. Litig.*, 532 F. Supp. 3d 1413, 1415 (J.P.M.L. 2021).

For all of these reasons and as a discussed below, the Panel should deny the Petition. However, to the extent the Panel disagrees, T-Mobile respectfully submits that the actions should be transferred to the Western District of Missouri or the District of Kansas. As set forth below,

these courts are far more appropriate because they are less congested, have fewer judicial vacancies, and are located in close proximately to T-Mobile's second headquarters.

## II. ARGUMENT AND CITATIONS TO AUTHORITIES

### A. The Panel Should Deny the Petition.

Transfer for coordinated pretrial proceedings is appropriate only when there are civil actions involving common questions of fact pending in different districts and transfer will facilitate the convenience of the parties and witnesses and promote the just and efficient conduct of the action. *See* 28 U.S.C. § 1407(a). There is no presumption in favor of transfer and consolidation under Section 1407. "[T]he proponents of centralization" must "convince[]" the panel that transfer for coordinated pretrial proceedings is warranted. *In re Fout & Wuerdeman Litig.*, 657 F. Supp. 2d 1371, 1371 (J.P.M.L. 2009). Moreover, the Panel has repeatedly made clear that "centralization under Section 1407 should be the last solution." *In re Baby Food Mktg., Sales Practices & Prods. Liab. Litig.*, 544 F. Supp. 3d 1375, 1377 (J.P.M.L. 2021) (cleaned up); *see also In re Fout & Wuerdeman Litig.*, 657 F. Supp. 2d at 1371. For the reasons set forth below, Plaintiff has not and cannot establish that the requirements for centralization are satisfied here, and the Panel should deny the Petition.

#### 1. *Multidistrict Litigation Will Not Promote the Just and Efficient Conduct of the Action.*

To satisfy 28 U.S.C. § 1407(a), transfer must facilitate the just and efficient conduct of the action. Plaintiff does not meet his burden of establishing that statutory requirement is met here. *See In re Fout & Wuerdeman Litig.,* 657 F. Supp. 2d at 1371 (proponent bears burden of establishing that transfer is proper). In particular, T-Mobile will move to compel arbitration of each named plaintiff's claims and establishing that each named plaintiff is contractually obligated to arbitrate is not a rote exercise that can be resolved with common evidence. For each plaintiff,

3

T-Mobile will present the court with individual, plaintiff-specific evidence establishing the facts and circumstances by which the plaintiff agreed to T-Mobile's Terms and Conditions that includes an arbitration agreement. That can occur several different ways, such as by (1) using T-Mobile's service, (2) paying for that service, or (3) signing and accepting the Terms and Conditions. *See* Exs. A–B (exemplar arbitration agreements for T-Mobile customers); *see also Saadeh v. T-Mobile USA, Inc.*, No. 2:21-cv-12871, 2022 U.S. Dist. LEXIS 11567, at *7 (D.N.J. Jan. 21, 2022) (explaining that plaintiff agreed to arbitration because he "signed T-Mobile's Terms and Conditions that contain an Arbitration Agreement"). T-Mobile also affords customers an opportunity to opt-out of the arbitration agreement, so for each named plaintiff, T-Mobile will also present individualized evidence that the plaintiff did not opt out. *See Saadeh*, 2022 U.S. Dist. LEXIS 11567, at *7 (explaining that T-Mobile's arbitration agreement includes an opportunity to opt out but finding plaintiff bound to arbitrate because he did not exercise that opt-out option).[1]

An MDL will not promote the just and efficient conduct of the action here. Transferring the related actions to a single court will not eliminate the need for these individualized, plaintiff-by-plaintiff assessments. T-Mobile would still be required to make the same individualized showing for each named plaintiff, and an MDL court would still be required to determine whether each named plaintiff is bound by T-Mobile's arbitration agreement. And there is nothing complex or specialized about a motion to compel arbitration that would support transferring the related actions to a single court. These are the types of motions that district courts handle routinely. *See*

---

[1] By filing class action lawsuits, plaintiffs have demonstrated that they dispute that they are required to arbitrate their claims. To the extent that plaintiffs oppose T-Mobile's motions to compel arbitration they will raise individual, plaintiff-specific defenses—a fact that further supports denying the Petition. *See, e.g.*, *Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 731 (E.D. Pa. 2014) (denying class certification because plaintiffs' argument that they were not bound by the challenged contracts on procedural and substantive unconscionability grounds "turn[ed] directly on individual questions specific to each Plaintiff").

*In re Fout & Wuerdeman Litig.*, 657 F. Supp. 2d at 1371 (denying transfer because the proponents "have not convinced . . . [the JPML that the issues] are sufficiently complex"). In fact, a search of the federal district court dockets shows that in 2022 alone, there were more than 1,700 motions to compel arbitration throughout the country.

An MDL would only add a layer of procedural complexity, increasing the likelihood that the timeline for resolving T-Mobile's motions to compel arbitration becomes protracted. The Panel addressed arbitration recently in *In re Uber Technologies, Inc., Data Security Breach Litigation*. *See* 304 F. Supp. 3d 1351, 1354 (J.P.M.L. 2018). In that case, the Panel granted a petition to transfer over Uber's objections that transfer should be denied because each named plaintiff was subject to individual arbitration. *Id.* at 1353. But what followed after the MDL was formed in *Uber* demonstrates why the Panel should *deny* the Petition here. In *Uber* the MDL court granted the motions to compel arbitration—terminating the litigation and foreclosing the parties from realizing any benefits of consolidation. Moreover, the MDL process may have stretched the timeline for resolving Uber's gating motions to compel arbitration. Multiple motions to compel arbitration filed in the underlying actions were not decided ***for more than five months*** after the MDL was formed. *See, e.g.*, *In re Uber Techs., Inc., Data Sec. Breach Litig.,* No. 2:18-ml-2826 (C.D. Cal. granted Apr.17, 2019) (ECF No. 41) (granting *unopposed* motion to compel arbitration filed March 10, 2018). This period is in contrast to the less than three months in which the same judge had resolved motions to compel arbitration in the past in other litigation. *See Dicarlo v. Moneylion, Inc.,* No. 19-cv-1374-PSG, 2019 U.S. Dist. LEXIS 228268, at *2 (C.D. Cal. Dec. 20, 2019) (Gutierrez, J.) (granting motion to compel arbitration filed Oct. 25, 2019); *Perry v. MLB Advanced Media, L.P.*, No. 18-cv-1548-PSG, 2018 U.S. Dist. LEXIS 239692, at *1 (C.D. Cal. May 30, 2018) (Gutierrez, J.) (granting motion to compel arbitration filed Apr. 17, 2018).

Moreover, the parties in *Uber* had to expend time and resources on MDL-specific activities that otherwise would not have occurred. For instance, in the MDL court, the parties briefed and presented argument on appointment of interim class counsel. *See In re Uber Techs., Inc., Data Sec. Breach Litig.,* No. 2:18-ml-2826 (C.D. Cal. granted Apr. 17, 2019) (ECF Nos. 8–11, 35). The MDL procedures and associated activities proved unnecessary because all of Uber's motions to compel arbitration were granted—which presumably would have been the result without multidistrict litigation. *See id*. (ECF Nos. 33, 41, 54). Simply put, the parties in *Uber* did not realize the benefits transfer under Section 1407 is supposed to provide.

In light of the parallels between *Uber* and this litigation, T-Mobile respectfully submits that denying the Petition is the appropriate course here. Denying the Petition does not require the Panel to pre-judge or assess the merits of T-Mobile's motions to compel arbitration. It simply allows the motions to compel arbitration to be decided just as they would have been but for the Petition. Likewise, denying the Petition does not foreclose consolidation at a later time in the event circumstances change. Although neither anticipated nor likely given the courts' consistent enforcement of T-Mobile's arbitration agreement, if the courts were to deny T-Mobile's motions to compel arbitration here, any party could file a new petition to transfer under Section 1407. Just recently the Panel explained that "the parties may file another Section 1407 motion, and the Panel will revisit the question of centralization" if conditions change in the future and Section 1407 transfer becomes appropriate. *In re Gen. Motors LLC Chevrolet Bolt EV Battery Prods. Liab. Litig.*, 532 F. Supp. 3d 1413, 1415 (J.P.M.L. 2021).

> 2. **_Transfer is Improper Because Individualized Issues Swamp Common Issues._**

The Panel has repeatedly held that transfer should be denied when individual factual questions predominate over common questions. In *In re Pharmacy Benefit Plan Administrators*

6

*Pricing Litigation*, the Panel noted that even when "actions clearly share common legal questions and, perhaps, a few factual questions," Section 1407 transfer is not warranted when "unique questions of fact predominate over any common questions of fact." 206 F. Supp. 2d 1362, 1363 (J.P.M.L. 2002); *see In re Rely Tampon Prods. Liab. Litig.*, 533 F. Supp. 1346, 1347 (J.P.M.L. 1982) (denying transfer despite the actions involving some common questions because "we are not persuaded that these common questions of fact will predominate over individual questions of fact present in each action"). For all of the same reasons described above in Section II.A.1, *supra* that transfer will not promote the just and efficient conduct of the action, the Petition should also be denied because of the individual factual issues that must be resolved to decide T-Mobile's motions to compel arbitration—a gating issue as to whether the litigation will proceed.

### 3. Transfer Conflicts with Strong Federal Policy Favoring Enforcement of Arbitration Agreements.

The Panel should also deny the Petition because Section 1407 transfer conflicts with the Federal Arbitration Act ("FAA") and the strong federal policy of enforcing arbitration agreements. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001); *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000). To further this federal policy, the Supreme Court has emphasized that courts should "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). It has directed courts to "ensure the enforcement of the arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

The Panel should deny the Petition because granting it creates an unnecessary tension between the rigorous enforcement of the parties' agreements to arbitrate disputes on an individual basis and the inherently collective nature of MDL litigation. That is the very type of class litigation that plaintiffs are barred from pursuing under contracts with T-Mobile. *See* Ex. A; *see also*

7

*Concepcion*, 563 U.S. at 344.  But denying the petition allows the routine process of individual arbitration to play out, thus avoiding any conflict with the agreements or the FAA.

### 4. *None of Plaintiff's Remaining Arguments Supports Transfer.*

Plaintiff lobs several additional arguments he contends support Section 1407 transfer, but none supports granting the Petition here.

- Plaintiff argues that an MDL is necessary to avoid the risk of inconsistent rulings.  *See* JPML Pet. 3–4.  Although a legitimate concern in many data breach actions, here a gating issue to any class action litigation is arbitration, and there is no risk of inconsistent rulings on that issue because each motion will be decided based upon Plaintiff-specific evidence.  That is, the same individualized, plaintiff-by-plaintiff assessment that makes transfer inconvenient and inefficient described in Section II.A.1, *supra*, also eliminates the risk of inconsistent rulings. And in the unlikely event the motions are denied and class action litigation proceeds, there is nothing that prevents the parties' from filing another petition for transfer for centralization.

- Plaintiffs' string-cite of other data breach lawsuits also does not support granting the Petition here.  *See* JPML Pet. 4.  None of those cases involved the gating arbitration issues that must be resolved here.  And demonstrated above, the experience in the *Uber* MDL demonstrates why the Panel should deny the Petition, not grant it.

For all of the foregoing reasons, the requirements of 28 U.S.C. § 1407 are not satisfied here.  The Panel should therefore deny the Petition and decline to transfer the actions for coordinated or consolidated pretrial proceedings.

### B. If the Panel Does Grant the Petition, It Should Choose a Transferee Court That Is Not Already Overwhelmed and Understaffed.

In the event that the Panel decides to grant the Petition, T-Mobile respectfully submits that the most appropriate districts are the Western District of Missouri and the District of Kansas. Those courts have zero and one judicial vacancies, respectively, and very little congestion. By contrast, three of the seven active judgeships in the Western District of Washington are vacant,[2] and the district's four active judges were all confirmed in the last 18 months and inherited significant backlogs. Both Western Missouri and Kansas, moreover, are located near T-Mobile's second headquarters, where documents and witnesses are likely to be found, and in the center of the country, making for convenient travel for the parties, witnesses, and attorneys who are spread throughout the country. And the Western District of Missouri has handled the existing MDL involving T-Mobile in an extremely efficient matter, thus proving that the district has the judicial and administrative resources to handle this type of matter. It is therefore unsurprising that the parties who filed positions with this Panel have overwhelmingly supported the Western District of Missouri, while another has supported the District of Kansas.

### 1. The Western District of Missouri Has No Judicial Vacancies and Both Districts Have Far Less Congestion Than the Western District of Washington.

The Panel regularly considers the docket conditions and available judicial resources in deciding where to transfer MDLs. *See, e.g.*, *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 110 F. Supp. 3d 1358, 1359 (J.P.M.L. 2015) (citing "judicial resources" and transferring MDL to District of Oregon, even though seven out of eight actions were pending in Western

---

[2] Hon. Jamal Whitehead was confirmed by the United States Senate on February 28, 2023. *Jamal Whitehead*, BALLOTPEDIA, https://ballotpedia.org/jamal_whitehead (last visited Mar. 10, 2023). Judge Whitehead will join the court upon receiving his judicial commission.

9

District of Washington); *In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 844 F. Supp. 2d 1371, 1373 (J.P.M.L. 2012) (transferring to district that "enjoys favorable docket conditions."); *In re Skechers Toning Shoe Prods. Liab. Litig.*, 831 F. Supp. 2d 1367, 1370 (J.P.M.L. 2011) ("[T]he Western District of Kentucky enjoys general docket conditions conducive to the efficient resolution of this litigation."); *In re Webvention LLC ('294) Patent Litig.*, 831 F. Supp. 2d 1366, 1367 (J.P.M.L. 2011) ("The relative docket conditions in the District of Maryland are more favorable than the other proposed transferee forums.").

Choosing a district with sufficient judicial resources is especially important here because the transferee judge will need to decide motions to compel arbitration involving at least 74 plaintiffs, and potentially more if additional actions are filed. As demonstrated above, each motion may involve highly individualized inquiries into each individual's relationship with T-Mobile and the circumstances and manner in which the parties entered into arbitration agreements. Unless the transferee court has extensive judicial resources to focus on these motions, there is a serious risk that resolving these highly individualized motions could take months or even years. This would undermine the efficient dispute resolution process that T-Mobile bargained for in its arbitration agreements and violate the FAA's policy of "mov[ing] parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).

In the event that any of T-Mobile's motions to compel arbitration are denied, the transferee court's judicial resources will become even more essential because the court will then need to manage cases that are legally, factually, and administratively challenging. Data breach litigation is a rapidly emerging and continuously developing area of the law. The judges presiding over such cases must frequently resolve hotly contested questions of first impression, such as: what

constitutes sufficient harm to show standing; whether and how common law concepts and general consumer protection statutes from various states apply to the twenty-first century problem of international cybercrime; and whether or how to certify a class consisting of a large and diffuse group of consumers. These cases are factually complex and frequently involve massive amounts of data and competing experts opining on technical questions of cybersecurity. Finally, these cases are administratively difficult and unwieldy, often featuring dozens of parties and counsel who are scattered across the country.

The significant judicial resources needed for these matters strongly favors the Western District of Missouri or the District of Kansas. The Western District of Missouri has no judicial vacancies; the District of Kansas has only one. The Western District of Washington, by contrast, has an unfortunate history of judicial vacancies. The district did not have a single judge confirmed between October 2007 and September of 2021, and long held the highest judicial vacancy rate in the country.[3] With three of the seven active judgeships still open,[4] the district currently has the

---

[3] *See* Gene Johnson, *Diverse Panel Recommends US Judge Candidates in Washington*, ASSOCIATED PRESS, Mar. 29, 2021, https://apnews.com/article/joe-biden-patty-murray-seattle-washington-maria-cantwell-cab5b94458c3c4ca0c47773fc35925bd (discussing nominations for "the badly understaffed federal bench in the Western District of Washington"); Madison Alder, *Short-Benched U.S. Trial Courts Face Post-Pandemic Crisis*, BLOOMBERG LAW (Apr. 9, 2020), https://news.bloomberglaw.com/us-law-week/short-benched-u-s-trial-courts-likely-face-post-pandemic-crisis (explaining that the Western District of Washington was "already dealing with an emergency before the coronavirus pandemic hit" due to the number of judicial vacancies).

[4] Hon. Jamal Whitehead, who was confirmed by the Senate on February 28, 2023, will join the Court upon receiving his judicial commission. *Jamal Whitehead*, BALLOTPEDIA (last visited Mar. 10, 2023). Two other nominations to the court remain pending. The remaining nominations, Tiffany Cartwright and Kymberly Evanson, were originally nominated by President Biden on January 19, 2022, and July 13, 2022, respectively. *See Tiffany Cartwright*, BALLOTPEDIA, https://ballotpedia.org/Tiffany_Cartwright (last visited Mar. 10, 2023); *Kymberly Evanson*, BALLOTPEDIA, https://ballotpedia.org/Kymberly_Evanson (last visited Mar. 10, 2023). However, neither Cartwright nor Evanson received a confirmation vote from the 117th Congress. Rather, the nominations were returned to President Biden when the Senate adjourned *sine die* on January 3, 2023. On January 3, 2023, the President re-nominated Cartwright. *Tiffany Cartwright*, BALLOTPEDIA. Similarly, he re-nominated Evanson on January 23, 2023. *Kymberly Evanson*,

country's third highest percent of judicial vacancies.[5] And the district's four active judges were all confirmed within the last eighteen months and are now in the unenviable position of having to learn an entirely new docket while attempting to reduce a significant backlog.

Given this history, it is unsurprising that the Western District of Missouri and the District of Kansas have significantly less congestion than the Western District of Washington. As of September 30, 2022, the Western District of Missouri had 1,286 civil cases spread amongst six active judges and four senior judges, for a rate of 128.6 civil cases per judge, and 171.46 civil cases per active judge.[6] Similarly, as of September 30, 2022, the District of Kansas had 945 civil cases spread amongst five active judges and three senior judges, for a rate of 118.13 civil cases per judge and 151.2 civil cases per active judge.[7] By contrast, the Western District of Washington had 2,316 civil cases as of September 30, 2022, spilt between four active judges and eleven senior judges, for a rate of 154.4 civil cases per judge and 463.2 civil cases per active judge.[8] Given that senior judges typically handle just 20% of a district court's total caseload,[9] the more relevant number is cases per active judge.

The lighter workload in the Western District of Missouri and the District of Kansas has translated into lower backlogs. During the last reporting period, the Western District of Missouri had just 3 civil motion that were pending for more than 6 months, and 22 civil cases pending over

---

BALLOTPEDIA. Both nominations are pending on the Executive Calendar for the 118th Congress, but no action has been taken as of this date. *See* S. EXEC. CALENDAR, 118th Cong., 1st Sess. 3-4 (2023).
[5] *See Current Federal Judicial Vacancies*, BALLOTPEDIA, https://ballotpedia.org/Current_federal_judicial_vacancies (last visited Mar. 11, 2023).
[6] *See U.S. District Courts—Civil Cases Commended, Terminated, and Pending*, U.S. COURTS (Sept. 30, 2022), https://www.uscourts.gov/sites/default/files/data_tables/jb_c1_0930.2022.pdf.
[7] *Id.*
[8] *Id.*
[9] *See* About Federal Judges, U.S. COURTS, https://www.uscourts.gov/judges-judgeships/about-federal-judges (last visited Mar. 11, 2023).

3 years.[10]  Similarly, the District of Kansas had 24 civil motions pending over 6 months and 31 civil cases pending over 3 years.[11]  By contrast, the Western District of Washington had 135 motions pending over 6 months as of September 30, 2022, as well as 73 civil cases pending for over 3 years.[12]  Moreover, as the district's Chief Judge recently noted, the court's backlog has gotten worse despite recent the influx of new judges, with cases on the "three year" list up 20% in 2022 from the year before.[13]  Similarly, the median time to bring a civil case to trial in the Western District of Washington—30 months in 2022—increased 30% from the year before.[14]  According to Law360, the Chief Judge recently noted that "the court continues to face logistical challenges with only four of its seven seats filled."[15]

    **2. *Location of Documents and Potential Witnesses Favors Western District of Missouri and District of Kansas*.**

The location of documents and witnesses also favors the Western District of Missouri and the District of Kansas.  To be sure, T-Mobile's primary corporate headquarters are located in the Western District of Washington and documents and potential witnesses are likely to be located there.  But relevant documents and potential witnesses are also likely to be located at the company's second headquarters, the location of Sprint's former headquarters in Overland Park,

---

[10] *See U.S. District Courts – Civil Cases Pending More Than Three Years*, Table CRJA 7, U.S. COURTS (Sept. 30, 2022) https://www.uscourts.gov/statistics/table/cjra-7/civil-justice-reform-act-cjra/2022/09/30; *U.S. District Courts – Motions Pending More Than Six Months*, Table CRJA 8, U.S. COURTS (Sept. 20, 2022) https://www.uscourts.gov/statistics/table/cjra-8/civil-justice-reform-act-cjra/2022/09/30;
[11] *Id.*
[12] *Id.*
[13] Greg Lamm, *New Wash. District Chief On His Plans For A Revitalized Bench*, LAW360 (Jan. 30, 2023) https://www.law360.com/articles/1569283/new-wash-district-chief-on-his-plans-for-a-revitalized-bench.
[14] *Id.*
[15] *Id.*

Kansas,[16] which is located within 25 minutes of the primary courthouses of both the Western District of Missouri and the District of Kansas.  Moreover, as noted above, the central dispute in this litigation is likely to be whether the plaintiffs are bound by their arbitration agreements with T-Mobile, and key documents and witnesses for those disputes are likely to be located in the 22 different home states of the 74 different plaintiffs.  Given that documents and witnesses for the most immediate, critical, and likely dispositive issue in these cases will be scattered across the country, districts in the center of the country are likely to be closer to more of the relevant documents and witnesses than a district in the Pacific Northwest.  *See infra* Section II(c).

In any event, the Panel has long recognized the location of documents and witnesses is less important than other factors given that discovery need not occur in the transferee district.  *See* David F. Herr, MULTIDISTRICT LITIGATION MANUAL § 6:3 (2022 update) ("The location of documents and witnesses was once a very important factor in selection of a transferee court; in the internet age the Panel recognizes that discovery can be conducted essentially anywhere and the fruits of discovery made available to all parties without needing to travel to the district where the action is pending."); *see also In re Tasigna Nilotinib Prods. Liab. Litig.*, 555 F. Supp. 3d 1363, 1365 (J.P.M.L. 2021) (transferring MDL to location different from defendant's headquarters without reference to the location of documents and witnesses); *In re Folgers Coffee Mktg. & Sales Practices Litig.*, 532 F. Supp. 3d 1416, 1417 (J.P.M.L. 2021) (same); *In re Ashley Madison Consumer Data Sec. Breach Litig.*, 148 F. Supp. 3d 1378, 1380 (J.P.M.L. 2015) (same).  Moreover, to the extent assigning the MDL outside of Washington would impose a travel burden on Washington witnesses, that burden would largely be borne by T-Mobile.  And it is a burden that

---

[16] Kevin Hardy, *T-Mobile CEO Commits to Uphold Sprint's Legacy, Keep Major Jobs Presence in Kansas City*, KANSAS CITY STAR, Aug. 3, 2020.

T-Mobile would be willing to bear to ensure that this matter is assigned to a court that is in the best position to efficiently and effectively manage it.

    **3. *The Western District of Missouri and the District of Kansas Would Be Central and Accessible Forums for This Nationwide Litigation*.**

  The Panel has often considered centrality and accessibility of the transferee forum in cases where the parties and actions are geographically diverse. *See, e.g.*, *In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Prods. Liab. Litig.*, 316 F. Supp. 3d 1380, 1381 (J.P.M.L. 2018) (selecting transfer forum that was "centrally located geographically, making it a convenient forum for this nationwide litigation"); *In re Sonic Corp. Customer Data Sec. Breach Litig.*, 276 F. Supp. 3d 1382, 1383 (J.P.M.L. 2017) ("We are persuaded that the Northern District of Ohio—a centrally-located and easily accessible location—is an appropriate transferee forum for this litigation."); *In re CenturyLink Residential Customer Billing Disputes Litig.*, 280 F. Supp. 3d 1383, 1385 (J.P.M.L. 2017) ("Minneapolis offers a central, readily accessible venue for all parties."); *In re Ashley Madison*, 148 F. Supp. 3d at 1380 (noting that the Eastern District of Missouri "is a geographically central and accessible forum for this nationwide litigation"); *In re Velocity Express, Inc., Wage & Hour Emp. Practices Litig.*, 581 F. Supp. 2d 1368, 1369 (J.P.M.L. 2008) ("Given the geographic dispersal of pending actions, as well as the nationwide business of Velocity Express, no particular district or region emerges as the focal point for this litigation. We are persuaded that the Eastern District of Wisconsin is an appropriate transferee forum for this litigation. It is a centrally located district with the time and resources to devote to this litigation."); *In re Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968) ("[A]lthough air travel renders both California and New York readily accessible, there is still something to be said for the convenience of a geographically central forum in coast-to-coast litigation.").

This is truly a nationwide dispute, with plaintiffs, counsel, and potential witnesses located all over the country, as noted above. Both the District of Kansas's courthouse in Kansas City, Kansas, and the Western District of Missouri's main courthouse in Kansas City, Missouri, are located just twenty minutes from the Kansas City International Airport, which currently offers direct flights to 46 cities, including New York, Los Angeles, Seattle, Houston, Dallas, Washington, D.C., and Atlanta.[17] And that airport just opened a state-of-the-art international terminal, which has increased the number of flights and has amenities to make travel easier.[18] Whereas the East Coast plaintiffs, counsel, and any witnesses would have to take a five- to six-hour flight to attend a hearing in Seattle, most of the country can reach Kansas City in just a few hours.[19] Where, as here, the number and geographic dispersal of actions is likely to continue to grow, a centrally-located forum like the Western District of Missouri or the District of Kansas is the most convenient option for the majority of the current and prospective parties.

### 4. The Western District of Missouri Has Experience with a Prior MDL Involving T-Mobile.

The last time T-Mobile was before this Panel, it found that "[t]he Western District of Missouri . . . has the capacity to efficiently manage this litigation." *In re T-Mobile Customer Data Sec. Breach Litig.*, 576 F. Supp. 3d 1373, 1375 (J.P.M.L 2021). The Western District of Missouri vindicated the Panel's judgment by handling that MDL extremely efficiently. Indeed, the court deftly managed several case management issues and ppreliminarily approved a proposed

---

[17] *See* Nonstop Destinations, KANSAS CITY AVIATION DEPARTMENT, https://www.flykci.com/flight-information/nonstop-destinations/ (last visited Mar. 11, 2023).

[18] *See* Clark Weitz Clarkson, *Kansas City's New Airport Terminal Is a Blimps at the Future of Air Travel*, CONDÉ NAST TRAVELER, https://www.cntraveler.com/story/kansas-city-airport-new-terminal-opening (last visited Mar. 16 2023); *Now Open: New Single Terminal at Kansas City International Airport*, VISIT KC https://www.visitkc.com/meetings/why-meet-kc/new-kci-single-terminal-now-open (last visited Mar. 16, 2023).

[19] *See* Number of Weekly Cataloged Flights from Seattle, FLIGHTSPHERE, https://flightsphere.com/flight-time/from/seattle/ (last visited Mar. 11, 2023).

settlement on July 26, 2022—less than 20 months after the Panel's December 3, 2021 transfer order. *See In re T-Mobile Customer Data Sec. Breach Litig.*, No. 4:21-MD-03019-BCW (W.D. Mo. July 26, 2022), ECF No. 162. The Western District of Missouri's familiarly with T-Mobile and proven ability to handle a case of this nature should weigh in favor of transferring this case to that district.

### 5. The Majority of the Parties Favor the Western District of Missouri.

The Panel appropriately values consensus and considers the transferee districts that are favored by the parties. *See, e.g.*, *In re T-Mobile*, 576 F. Supp. 3d at 1375 (finding that "[t]he Western District of Missouri is an appropriate transferee district for this litigation" in part because "[t]he district is supported by defendants and, in the alternative, by several plaintiffs, including movants."); *In re SFBC Int'l, Inc., Sec. & Derivative Litig.,* 435 F. Supp. 2d 1355, 1356 (J.P.M.L. 2006) (relying on the fact that the District of New Jersey was "the preferred transferee forum of several responding parties" in deciding to transfer the MDL to that district); *In re Anthem, Inc., Customer Data Sec. Breach Litig.,* 109 F. Supp. 3d 1364, 1365 (J.P.M.L. 2015) (selecting Northern District of California as transferee district and noting that "[n]umerous plaintiffs support centralization in this district, both in the first instance and in the alternative.").

Here, three of the four plaintiffs to file positions with the Panel have supported the Western District of Missouri as a first or second choice.[20] In their filings, those plaintiffs cite largely the same factors as T-Mobile has articulated herein, including the centrality of the district, its favorable

---

[20] Plaintiff Clark (movant) supports the Western District of Washington, or, in the alternative the Western District of Missouri; Plaintiff Gonzalez supports the Western District of Missouri; Plaintiff Cortazal supports the District of Kansas, or, in the alternative, the Western District of Missouri.

17

docket conditions, its proximity to documents, witnesses, and T-Mobile's second headquarters, and its efficient handling of a prior T-Mobile MDL.

### III. CONCLUSION

For the foregoing reasons, the Panel should deny the Petition and permit the current courts to decide the individualized issues about the named plaintiffs' arbitration agreements. Alternatively, if the Panel decides to transfer the actions for coordinated or consolidated pretrial proceedings, it should transfer these actions to the Western District of Missouri or the District of Kansas.

Respectfully submitted this 16th day of March 2023.

/s/ Kristine McAlister Brown
Kristine McAlister Brown
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
kristy.brown@alston.com

*Counsel for Defendants T-Mobile US, Inc. and T-Mobile USA, Inc.*